The next case of the day is Sealed Appellee 1, Sealed Appellant and so on. Mr. Andes, we'll hear from you. Ladies and gentlemen, my name is David Andes. I'm here representing the Sealed Appellant. The rule of full disclosure minimizes the role of the judiciary, vesting greater control in the parties who have chosen the arbitration process. If faithfully adhered to, it will ultimately lead to fewer post-decision challenges to awards based on bias or prejudice. That is a quote from the Tuco case, which is a Texas Supreme Court decision in 1997 that set up the test for evident partiality under Texas law. Filtration of partiality in arbitration is the exclusive prerogative of the parties and only the parties. Under Texas law, it is a party's right to have all the information disclosed by the arbitrator so that the party, not the courts, not the arbitrator, can decide whether to accept the candidate or reject the potential arbitrator. Judge Owen, your former court, in May of this year, unanimously reinforced the full disclosure requirement by holding that a party does not waive an evident partiality challenge when some information is disclosed and the non-disclosing party does not conduct any further investigation. That is, a non-disclosing party may have actual knowledge of some information but has no duty, no duty, to investigate any further or risk waiver. Further, disclosure or knowledge of the existence of a relationship. What are you complaining about now? Your Honor, we are, we've got several points on appeal. My primary purpose today is to talk about the failure. What are you complaining, what is, I'm sorry, go ahead and answer that, I'm sorry. We're complaining about the wholesale failure of an arbitrator appointed by a party to disclose an extensive relationship between herself and the lawyer for the, one of the parties. Yeah, but what is this extensive relationship you're talking about? Your Honor, I have a list. It seemed to me like it was pretty trivial. Your Honor, I have a list of items here. First of all, Mr. George Shipley, who's counsel for Federal Insurance Company in the arbitration, worked at Baker Botts Law for 34 years. Yeah. What are you centering on, though? I mean, I understand that, but go to weddings? I mean, where do you draw the line in this? Go to weddings, go to parties? It's the collection in this case, Your Honor. It's the totality of what was not disclosed. Okay, so it's a single thing that's not disclosed. Well, in this case, not a single thing was disclosed. Not a single thing. Nothing. All right, and then, but then your side had equal relations with some of the lawyers involved in the case. I mean, it was just, you know, how do you get out of law practices so inbred now with everybody, musical chairs going from one firm to the other? I mean, how do you find somebody that's pristine, pure? And I don't know that that's a requirement, Your Honor. That's basically what you're saying. Well, the name of the game is you lose the arbitration, then you look. I'm sorry, Your Honor? Lose the arbitration, then you start looking for all these conflicts. I mean, that's the way I read some of this happening. When you start talking about somebody, well, they had an extensive conflict. They were practicing law together for 20 years. What, you know, like you didn't know that? I mean, you would have thought they were going to a wedding or a party or had some sort of social contact. Baker Botts is not exactly a, you know, small little law firm. They got the case before the Supreme Court, now seeking an additional few million more on top of six million. It's a big operation. I mean, you know, that's what troubles me about that. I don't mean to represent your client, but I have a hard time seeing what that adds up to. Your Honor, first of all, it starts with nondisclosure. We have nothing. We've got nothing. No, no, no. No, no, no. I mean, you have got something. She does tell you, you know she's practiced with Baker Botts, and you know she's practiced a long time, and you know Mr. Shipley's been there for a long time. So, I mean, there are a lot of assumptions that you can surely make that a reasonable person can make from that. Are you talking about the disclosure requirement itself, that if that's common knowledge, there's no need to disclose it, Your Honor? Well, more or less. I mean, if it's not common knowledge. But, I mean, if you know someone who's been practicing law with someone else for 20 years, and you knew that, you had to know that, right? I personally did not know that, Your Honor. Well, I mean, just a little minimal kind of research, or not even research, but just common knowledge. If you know both of them have been with Baker Botts. Well, you have an arbitrator, you don't look, you don't, you don't, you've got an arbitrator, you look down there, and you don't look them up and see what the background is you're going to be arguing before these people? Your Honor, I can't tell you what obviously everybody does, but I do think that. Well, I mean, what do you do? Do you just put the first six of you in the box, and we'll try this case right here? You don't do that. Your Honor, I mean, first of all, we looked at the disclosure. And we rely upon the disclosure of the arbitrator herself. And at that point, then the question becomes how far. . . What did she disclose? What did she disclose? Nothing. Did she have a curriculum vitae attached or anything? No, ma'am. Did she disclose that she had practiced law with Baker Botts? She didn't even disclose that? No, Your Honor. Nobody knew Diana Marshall. I'm shocked nobody knew Diana Marshall where she came from. Well, I'm not saying that. I'm saying that she disclosed nothing. Well, I mean, she's a well-known figure in Houston. Everybody knows who she is and where she's been. Knowledge of someone's status, Your Honor, I don't think equates to knowledge of the details of relationships that she may have on an ongoing basis. How many lawyers in Houston are qualified as arbitrators if you say they worked together at a big firm and they socialized? And I'm not saying that that disqualifies the arbitrator, Your Honor. All I'm saying is it starts with disclosure. So everybody that you have to say, well, I was with three big firms and then ask am I currently? That's a huge disclosure obligation. How many weddings did I go to? How many parties did I go to? How many luncheons did I have with so-and-so? And the arbitrator is the person who has exclusive knowledge of that information, Your Honor. Not really. Well, your argument sounds very close to essentially saying that the disclosure itself revitiates the arbitral award, nondisclosure. Even though the lawyers knew the information, if they breached their obligation to disclose it, is that true? I'll say it another way. Does the circumstance that this is common knowledge and you knew it itself solve the problem or not? Your Honor, if I understand. In other words, can you set it aside even though you knew about it? Under Texas law, Your Honor, which is different. Well, yes or no on that. I mean, you can tell me why, but under your theory, is that enough? Under the current state of Texas law, yes, Your Honor. That would be set aside. It comes down to that. A nondisclosure, maybe that's one reason you don't want to check them out. You know they're okay, but I don't want to do much searching because I'll lose the searching if I lose. Well, that raises another question, Your Honor. How far can you search before you find this missing pearl, if you will, of information? Like where your arbitrator practices law? I mean, I really found it incredulous that you would try a large arbitration case before three arbitrators that you don't know anything about. I participated in arbitration. Most of the lawyers have, even 40 years ago when I was in private practice. Let me tell you, I knew two of the arbitrators very, very well, and the third one they picked, I did everything in the world to find out about them because that was going to be the decider. I thought I would have been malpractice if I didn't know where they practiced, what they did, and what they had written and thought about the best I could find out. Am I missing something here? I'm just trying to understand the argument. I believe the argument, Your Honor, is in a wholesale failure to disclose anything whatsoever. The question is how much of that then shifts to the nondisclosing party to go and ferret out the information because admittedly some information— So what do you have other than the Baker-Botts? I'm sorry? What do you have other than the Baker-Botts connection? Well, the Baker-Botts starts the connection, and then we have personal connections between almost every lawyer in the law firm representing the other side and the sole law partner of Ms. Marshall that was not disclosed. Obviously, we have a dinner party together between the spouses and the lawyer and her partner. We have a golf outing. We have a wedding and possibly a wedding that was attended— This is not with her. This is with her law partner, correct. With her law partner. That's right. Whom your lawyer, Mr. Benton, had even greater association with. I don't know— That's what they say. That's what the briefs indicate. And that's what the briefs say, but I don't know personally, Your Honor, whether or not that's true. Well, you haven't challenged it. I haven't seen you in a reply brief say it's a bunch of lies. I'm just going off the record before the court, Your Honor, before the district court. Okay. I'm not trying to introduce additional evidence because we were—as part of our complaint is that we were limited in our ability— and the law partner and then second step between the arbitrator. Where does that give rise to evident partiality? Your Honor, under Texas law, the view is that it's an objective observer test. And that's the— That's the test. An objective observer would think that because Diana Marshall's law partner, Lewis, was—I'm sorry, Shipley, was friends with Mr. Lewis and had a social relationship, that that would mean she would favor Mr. Lewis. Well, and again, it's in terms of might. The Texas Supreme Court has said that evidence of evident partiality under the Texas Arbitration Act, if the arbitrator does not disclose information which might— Might, but go on and continue.  To an objective observer. Objective observer. That's where I'm saying, what objective observer would say that? I mean, is that a legal question or is that a fact question? It may be a fact question, Your Honor. What if this case were in Tyler? I'm sorry? What if this case were in Tyler, not Houston? Or Bay City? Again, full disclosure. We're not arguing whether it actually disqualifies them to serve as an arbitrator. What I'm asking about the test, would someone reasonably think, because there are relationships between these people, that that might cause them to be partial? Your Honor, I don't know if it's a geographic test. Well, I'm looking at the realities. I understand. I would say that, you know, I don't know. I honestly don't know if in Tyler it's different than, say, in Houston or Austin. I just know that that is the test the Supreme Court has set forth that we are here struggling with. Well, as you know, I did not agree with the test, and Tom Phillips, who wrote the opinion, is sensitive about it, at least privately. But in any event, it is the law. Yes, Your Honor. And again, it not only just might, but it's a reasonable impression of the arbitrator's partiality. And I think that the Texas Supreme Court is viewing that they want full disclosure. They have yet to find a case of waiver. They have yet to excuse any nondisclosure that has reached them. Should we certify this case? I think if you did, Your Honor, they'd come back and say, see the Tenasca opinion that came out in May of this year. And I think that's been answered. I really do. I mean, from your point of view, what does Tenasca hold? And in Tucson. That a party does not waive an evident partiality challenge by having some knowledge of the existence of relationship, but not the substance or details. Okay. Assume that we assume that the objection here was not waived, and we go straight to the merits. So what difference does that make? We go straight to the merits. What does Tenasca have to say about that if we go to the merits of this case? I don't know that Tenasca would address that question, Your Honor. Okay. So we don't have to decide whether you waived it or not. If we just skip right over it and say it's all trivial. And that would be the next, that would actually be the question. Is it trivial or not? That's the question because we haven't got to decide the objection. I mean, if we decide that the objection is immaterial. Correct. And, Your Honor, the district court originally vacated the award because the connection was not trivial. Then the district court vacated the vacator. Tell us why it's not trivial. Because, again, the collectivity of the information that was not disclosed. You mentioned a minute ago about a pearl. How did I know there's a pearl in here? Where is the pearl here that you referred to that you missed by failure of nondisclosure? It's the collection of information that was not disclosed. There are pearls, not a pearl. Collectively, yes, Your Honor. Collectively. The district court did not reach the triviality issue on the second Gilbrown because she found waiver based on the Tanaska case that came out of the Dallas Court of Appeals that then was subsequently reversed by the Texas Supreme Court. Are you saying that we would have to remand for her to make that decision? Or is it just simply a matter of law? We could just simply say that this does not amount to evident partiality. Your Honor, I believe that the evidence that is already in the record supports that it is evidently partial and it's not trivial. But if this court believes otherwise, and it could reverse and render based on that, if it believes that there's a question of triviality, it would have to reverse and remand and we would have to be allowed discovery to then develop the record for the district court. You set up this interesting device to hide from the arbitrators the effect of their decision. How did that work? I don't understand the question. I thought there was a . . . The arbitrator determined what the legal questions the arbitrator would settle would be and what the dollar consequences of the answer would be. If question one is yes, one party is awarded a million. If questions one and two are no, one party is awarded seven million. Does that mean that the arbitrators did not know which party would prevail depending on the answers? I suppose they could have figured it out because obviously at the hearing the parties were arguing very specifically for certain answers. We were arguing for, I believe we were arguing for no and they were arguing for yes. Why would you set it up that way unless it was to create a blind system so that the arbitrators would be determining an abstract question without knowing the particular outcome of it? I think we . . . And why isn't that relevant to whether the inquiry is to the objective observer? I mean, I don't . . . Even if they're in there trying for you, they're going to have to figure out which it is. Maybe you could say that's evident. If it's yes or no, one . . . Well, I think at the hearing, Your Honor, it was very clear . . . If that's true, then why did you do it that way? I think we were trying to get the most objective, unbiased panel that we could. I do. And I don't think it worked. I think we tried. Okay. Thank you very much. You saved some time for rebuttal, Ms. Anders. Ms. Maddox. May it please the Court, Amy Douthat Maddox for Federal Insurance Company, who is the sealed appellee in this case. Based on opposing counsel's argument and the Court's questions, I plan to concentrate my argument on evident partiality and waiver. If I manage my time well, also probably touch on the issue of discovery and that goes along with the issue of remand that Judge Jolly brought up. I don't plan to address subject matter jurisdiction or the exceeding authority manifest disregard, et cetera, unless the Court has any particular questions on those. There is not a single case that supports vacating an arbitration award on facts that are so tenuous and so remote in time as they are in this one. There is also not a single case that holds that a party or a party's attorney can have actual knowledge of the very facts that they later argue constitute evident partiality but keep those facts or that knowledge in their back pocket until they find out whether they've won or lost the arbitration and then argue, well, there was no disclosure, so it doesn't matter what we knew. There's evident partiality simply from the fact that there was no disclosure at all. This case is governed. I don't think there's much dispute about the law. Is there any record development of whether there was actual knowledge of the fact of the law firm connections? Yes, there was. There was an evidentiary hearing held before the district court. Several people testified. The court also stated with agreement of the parties that the affidavits that were submitted in connection with federal's motion for reconsideration would also be part of the record. And then Great American's lawyers were able to cross-examine all the Shipley, Snell, Montgomery attorneys that were there, and Mr. Shipley called Mr. Andis and Mr. Benton to the stand. There was evidence from Mr. Shipley. There was evidence from Ms. Snell. There was evidence from Mr. Benton that they had actual knowledge that George Shipley was at Baker Botts, that Ms. Marshall's partner, Mr. Lewis, was at Baker Botts. There was also evidence that when Ms. Marshall was designated, which was done by letter, there was a link to her website. Mr. Shipley sent the letter to Mr. Andis. There's a link to her website. And merely clicking on her website and clicking on Diana Marshall shows that she was at Baker Botts for a number of years. And, in fact, going to Judge Owen's question, her CV was on there, her resume was on there as well. And the district court made fact findings. And, to some extent, I think that's where TANASCA comes in. The district court made fact findings. Four places the district court said they had actual knowledge, including of Ms. Marshall, because the evidence that was presented at the hearing was, before Ms. Marshall was designated, federal designated Murray Fogler of Beck-Redden. Has the Texas court, in Texas law, developed the impact of the actual knowledge? Did it translate only into a waiver? Or how does that handle in the Texas law? Well, the three cases are basically a trilogy of cases, Tuco, Mariner Financial, and TANASCA. The concurrence in Mariner Financial discusses a little bit where should certain knowledge go. All of those cases, though, say, Tuco says in footnote 9, a party who knows of a conflict before an arbitrator issues an opinion must promptly object to avoid waiver. In each of those subsequent cases, did they find waiver? No. Mariner Financial discusses all the waiver cases, including from other jurisdictions, and notes that those cases hold that there's waiver when there's an undisclosed relationship is either well-known or easily discoverable. But Mariner Financial was a summary judgment case, and the court held that there was no summary judgment evidence that they could have discovered anything had they trot, and so that case was remanded. TANASCA is a case that, again, the court held that there was no waiver in that case. In that case, again, based on the trial court's fact findings in that case, the arbitrator had made some disclosures, and one of the disclosures he made is that he was affiliated, he was a director of this legal outsourcing company, and that he'd had a meeting with the law firm that was representing one of the parties in the arbitrator, a large law firm, 750 members or something like this, but that it wasn't clear that there would ever be any business. The facts that came out there were that not only did he have a much greater role in this legal outsourcing company, but he had contact not just with the law firm but with those two members that were before him, ongoing contact, where he was trying to solicit business on behalf of this company from the very people who were appearing before him. And so, obviously, the Supreme Court said, well, that's a situation where a reasonable observer can look at that and say, well, he might be more likely to favor this side because he's trying to get their business right now. If you contrast that with our facts, what we have here is everybody knew that all these people worked at Baker Botts together. Miss Marshall worked at Baker Botts some 16, 17 years ago. I don't think we know what month she left, so we can't... somewhere in there. 16, 17 years ago, almost two decades ago. Her partner, who was not the arbitrator in this case and had nothing to do with the arbitration in this case, there's no allegation that he did, was there some five years before the arbitration. And they were able to examine anybody they wanted to at this evidentiary hearing. Let me... one question about... Yes. Now, an earlier third arbitrator was dismissed. For what reason? He wasn't really dismissed. What happened is Federal appointed him, and this is actually the evidence... Who appointed him? Our side, Federal Insurance Company, appointed Mr Fogler as our arbitrator. And he's with Beck Redden, and he made some minimal disclosures, and then what happened is they went and fished around on the Beck Redden website, and they found out that Beck Redden had represented Memorial Hermann and some other stuff. Memorial Hermann was an insured, et cetera, et cetera. They came back to us and had some questions, and we said there was... They did their research. And nobody ever objected to him, is how it came about. It just seemed like they weren't ever going to agree, so we said, never mind, we're going to nominate... We're not going to give you a built-in error. Yeah, so we nominated Marshall instead. And that was the basis for the district court's findings. She found that... I didn't mean to distract you from your argument. She found that they knew about Marshall as well, because she found it inconceivable, particularly based on the investigation they did of Fogler, that they didn't at least click on the website and look. So everybody knew that all these people were at Becker Botts many years before the arbitration. Everybody knew that. So... They want to make more. They say that there is a collection of contacts. But the evidence came out, and the evidence was as to Miss Marshall... Even when they were at Becker Botts, they never worked together. The only time that George Shifley could remember anything was that she apparently participated in the in-house NIDA program when he was a second- or third-year associate, and he was required to go to that. This was all 17 years ago. Gosh, this would be more than 17 years ago. That's when she left. This is when he's a young associate. He has run into her a couple of times, or may just be once, at an American College of Trial Lawyers luncheon that had some 200 people in there, and clearly he knew her to say hi because they used to work at Becker Botts together. This is the evidence that came out. As to Mr. Lewis, who, again, was not the arbitrator in this case, the evidence was that, again, there was really very... Mr. Shifley never worked with Mr. Lewis. Ms. Snell, who was the other... There were three attorneys at Shifley Snell who worked on the arbitration, Mr. Shifley, Mr. Snell, and Ms. Miller. Ms. Miller never worked at Becker Botts, so that has never been an issue. Ms. Snell remembers that she did, as a young associate, one research project for Mr. Lewis. She can't remember what it was about or anything about it, but she thinks she did a research project when she was young. Then... Oh, go ahead. In this case, whether to rule in your favor, do we make any law? No. To rule in their favor, do we make any law in this case, or is this just really as far as the legal issues or as far as worthy of publication is essentially a wash? Well, I think the legal standard is pretty well established. I certainly contend if you rule in their favor, you're going to have to depart from that standard. OK, but how? I mean... Well, because... But obviously, as they point out, we do not contend. The law is you should err on the side of full disclosure. Sure. But it's also clear that the consequence for a nondisclosure is directly tied to the materiality of the information. And the Texas Supreme Court has said at least three times that you need not disclose relationships that are trivial. And this reflects a balance, obviously. It's trivial in the context of the question being asked. Right. I'm sorry? Trivial in the context of the question being asked, such as a relationship between two people in Becker-Potts. I wouldn't say in the abstract it's trivial, but it's trivial in the context, arguably, as to whether that would disqualify you later from... Trivial is a relative term. And these cases are obviously all done on a fact-by-fact basis, case-by-case basis, depending on the facts. But it was great Americans' burden of proof to show evident partiality here. And all they have shown is that there is a... At most, at the very most, that there is a tangential social relationship, not with the arbitrator, but with the arbitrator's partner and one of the attorneys for the parties. And there's two more points I want to make under Texas law that the Texas Supreme Court has mentioned. One, there's a distinction between past and current context, because if it happened in the past, it's clearly not the same thing as something that's going on right now. There's also a distinction that's been made... Some parties in certain cases have said, oh, there has to be maybe a more direct financial tie, and courts have rejected that and said, no, it could be a familial relationship, or it could be a close social relationship. But the only thing that courts have... And really, the Carlson case is the only one that goes into a close social relationship, and those facts are nothing like the ones here. But it has to be a close social relationship between the party or the party's attorney and the arbitrator, not a tangential social relationship where Mr Shipley played golf with Mr Lewis, who was not the arbitrator, and he did it at a firm event where they were randomly paired together. And that... Those facts go directly to the fact that everybody knew they were at Becker Botts together. Everybody knew that. No one has really contested that. But what they want to say is, well, there are these additional facts, but the additional facts all really stem from the fact that everybody was at Becker Botts together at some point in the past. Because, for instance, even this wedding issue, no one remembers Mr Lewis ever being at any wedding. But Mr Shipley said, I sure invited a lot of Becker Botts people, and I can't say positively that he wasn't one of them. Don't remember it. And that goes also both to your question about do you have to remand for triviality, and I believe his answer was that you do, because he wants more discovery. We disagree. The court found waiver, and we think that's supported, amply by the record. But if it's not for some reason and you were to disagree, the court can always affirm on alternative bases. And the record was fully developed. We had some discussion back and forth about discovery before this hearing. The judge set a hearing, and they wanted to take some depositions, and we did some letter briefing to the district court, which is her internal procedures for how to deal with that. And we argued, you don't need depositions. We'll bring everybody from our law firm that you want. We'll bring them to the hearing. We're only talking about Mr Lewis, because at the time they didn't even want Ms Marshall's deposition. But we said, he's within subpoena range. He's right down the street from the courthouse. You can subpoena him if you think you need him. Obviously the same would be true as to Ms Marshall. And we asked that they be at the hearing so that we could cross-examine them on the waiver issue. Their position the whole time was that we didn't get to do that, because their actual knowledge just didn't matter, which is not at all Texas law. But this was briefed to the court. The court came back and said no depositions. We're having a full evidentiary hearing. The court was well within its discretion in denying those depositions. If for no other reason than there was a full evidentiary hearing and there's nothing that they needed that they could not get.  It's interesting. The speedy alternative to judicial resolution keeps it out of the federal courts.      It keeps it out of the courts. It's got to come in full circle. You can't stay out of the federal courthouse, I'm convinced of that. I see I don't have a lot of time left, so I want to talk about a couple of things that were raised, particularly whether TANASCA means that the waiver must be reversed. I think I got sidetracked somewhere, but in Tuco, the court said if you have actual knowledge, it's waived. In Mariner Financial, it cited all those cases saying if it's well known or easily discoverable, it's waived, but those aren't our facts here. We're on a summary judgment record, and there's no evidence that they could have found this out. In TANASCA, the court found no waiver, but it cites both Tuco and Mariner Financial's statements that a waiver occurs if you know facts and did not object. There is no dispute here that they knew. All that they did not know, arguably, is, well, frankly, stuff that I don't know that Ms. Marshall has any obligation ever to disclose. Each golf game and one single dinner in 23 years that her partner has with somebody. But anything that wasn't disclosed directly relates to the fact that they were all at Baker Botts at the same time. That's actual knowledge. The court found actual knowledge, and that is sufficient in and of itself, and clearly is Texas law. There's no indication anywhere that a Texas court has said that you can just wait, even if you know these things, and wait and come back and wait until the ruling is adverse and then start looking into the evident partiality question. I think my time is almost up. The court has... I think you've timed your argument pretty well. Mr. Andes, we'll hear from you, please. Your Honor, it's important to remember this is a Texas Arbitration Act case, not a federal Arbitration Act case. In Tanaska, the case that the Supreme Court found no waiver on, the nondisclosing party also was aware of the facts that they were complaining about on appeal. The difference was, in that case, first of all, the arbitrator made those disclosures, whereas in this case we've got zero disclosures from the arbitrator. In that case, the Texas Supreme Court said it's not good enough that you disclose some of the information, for example... Is there any evidence that Diana Marshall knew that Lewis had played golf with, is it Shipley, or that Lewis had been invited to Shipley's daughter's wedding? We have no evidence of that on the record because we were not permitted to depose Ms. Marshall. That's an evidentiary hearing, they tell me. We did not have depositions. We did not have any pretrial... Was Diana Marshall at the evidentiary hearing? No, Your Honor. Could you have subpoenaed her? We could have subpoenaed her. And did you? We did not. Because we had no discovery, we had no idea what she would say. Was Mr. Lewis at the hearing? He was not. Could you have subpoenaed him? We could have. But again, without any discovery, we had no way to cross-examine them. We had no way to test the veracity of the statements, the completeness of the statements. Well, that's an interesting theory of trials, but I must say that... I mean, do you really expect an... If I can't take their deposition, I don't dare put them on the stand,  Well, Your Honor, then we should probably just go to trial. We'd have a lot faster cases if we didn't have discovery. Well, you did go to trial on evidentiary hearing. That was an effective trial. Without discovery, Your Honor.  Without discovery. Without discovery, Your Honor. But, you know, cross-examination is cross-examination, and you could have... You know, you're always afraid to ask a question you don't know the answer to, and you just have to step up to it, to that point, ask a question you don't know the answer to. Was Diana Marshall's web link site sent to your side? I did not get a printout of that. I got a transmittal letter that had it listed there. With a link. And was all the information that counsel said was on the website on the website? I do not know. I honestly believe that the details of the relationships that we're complaining about, the golf games, the dinner parties... So you think Diana Marshall would know that Mr. Lewis had played golf with Mr. Shipley once or twice and that Mr. Lewis might have been invited to Mr. Shipley's daughter's wedding. You think Diana Marshall knew that 17 years after she left Baker Botts? I think Diana Marshall knew that Mr. Lewis had a relationship with not just Mr. Shipley but almost all the attorneys at Mr. Shipley's firm. He was several feet from her and could have gone... But you didn't subpoena her to ASCA because you hadn't had discovery. Yes, Your Honor. That's pretty weak.  It is what it is. It is what happened, Judge. But, again, the point here is I believe the focus, instead of it being on the nondisclosing party... What do you expect a reasonable arbitrator to disclose about their law partners? Do you expect them to go to every law partner and say, have you ever played golf, tennis, volleyball with any of these people? Have you ever been invited to any of their weddings and give them a list of every lawyer involved? I believe it would be simple enough to say, I've got an arbitration request from this person. Do you know them? Do you have any relationship with them? And ask the question and then disclose the answer. And what would the answer typically be when you've been... Lewis had been gone for Baker Botts several years. Diane Marshall had been gone since the 90s. Right, and, again, that would have been disclosable. What would have been disclosable? The existence of the relationship and the details. Well, anybody that had gone to the website would have known  What beyond that do you expect an arbitrator to disclose? Whether they worked together on cases, whether they had social relationships, whether they attended social functions together. And there's no evidence they worked together on cases? The only evidence that we have is what Mr. Shipley said in his affidavit. And you did have the affidavit. Was it agreed that the affidavit could be used as evidence at trial? The affidavit was admitted as trial, yes. And you could have called Mr. Shipley at trial, you could have called Mr. Lewis, you could have subpoenaed them? We did call Mr. Shipley at trial. And, yes, we could have subpoenaed Mr. Lewis. And you don't think Mr. Shipley told the truth? Well, I believe what he says is I can't recall, in which case then I believe the records, the documents that we were not allowed to get, would help shed light on the records. So you come up with an invitation that was sent in the mail to Mr. Lewis, then do you go to the jewelry store to see if he gave her a gift and how much? Well, I believe we could have asked Mr. Lewis about the details of his relationship to prepare for the trial. I mean, just where does this end is what I'm getting at. I believe it ends with the arbitrator making full disclosure. And I believe it starts and ends. What is full disclosure, though, Matt? Full disclosure, according to the Texas Supreme Court, would be the existence of relationships and the facts about those relationships. Well, you know, it's interesting that Baker bought you to play golf with him, but to put a finer point on that is that it's a firm gathering and they end up signing people on a random basis, and I'll just quote random basis, and the hallmark of that is that they're trying to introduce the partners and associates to each other from time to time. As long as they don't know each other, they get to play together. I mean, that's the real world. It's a social relationship. The only way they got them to play together was to tell them you got to go play together. I'm just shocked any Baker-Botz lawyer knows how to play golf. And that's a four-and-a-half, five-hour time together to get to know each other. I've looked at a lot of time records and attorney's fee applications. I never saw any time left for golf in this whole precedent bar. Okay. Well, thank you very much for your argument.